















PLA   6/4/02   10:49
3:02-M -01252   USA V. DOMINGO
*1*
*CRCMP.*

COMPLAINT

# UNITED STATES DISTRICT COURT

### FOR THE

### SOUTHERN DISTRICT OF CALIFORNIA

'02 mg 1252 RBB

|  |  |
|---|---|
| UNITED STATES OF AMERICA | COMPLAINT FOR VIOLATION OF |
| v. | United States Code  Title 18 |
| RIDWAAN DOMINGO | Section 2113 (a) |

BEFORE  Ruben B. Brooks                    San Diego, California
         NAME OF MAGISTRATE                         ADDRESS OF MAGISTRATE

THE UNDERSIGNED COMPLAINANT BEING DULY SWORN STATES:

## Count 1

That on or about June 19, 2000 at San Diego, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 9994 Scripps Ranch Boulevard, San Diego, California, United States currency in the amount of $7,000.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113 (a).

That on or about June 29, 2000 at San Diego, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 5825 Balboa Avenue, San Diego, California, United States currency in the amount of $1,615.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113 (a).

## Count 3

That on or about August 10, 2000 at San Diego, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Wells Fargo Bank, 4380 La Jolla Village Drive, San Diego, California, United States currency in the amount of $5,150.00 belonging to, or in the care, custody, management or possession of Union Bank of California, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113 (a).

## Count 4

That on or about August 31, 2000 at San Marcos, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 295 South Rancho Santa Fe Road, San Marcos, California, United States currency in the amount of $14,109.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

That on or about November 6, 2000 at San Marcos, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 295 South Rancho Santa Fe Road, San Marcos, California, United States currency in the amount of $10,079.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

<u>Count 6</u>

That on or about January 24, 2001 at Chula Vista, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 501"H" Street, Chula Vista, California, United States currency in the amount of $8,262.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

<u>Count 7</u>

That on or about March 5, 2001 at Vista, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 935 E. Vista Way, Vista, California, United States currency in the amount of $4,435.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

That on or about July 2, 2001 at San Diego, California within the Southern District of California:

RIDWAAN DOMINGO

did by force, violence, and intimidation unlawfully take from the person and presence of employees of Washington Mutual Bank, 9994 Scripps Ranch Boulevard, San Diego, California, United States currency in the amount of $5,072.00 belonging to, or in the care, custody, management or possession of Washington Mutual Bank, which was then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

And the complainant states that this complaint is based on the attached probable cause statement which is incorporated herein by reference.

_____
Signature of Complainant

Matthew Brown
Special Agent, FBI
Official Title

**Sworn to before me, and subscribed in my presence, June 4, 2002.**

_____
United States Magistrate

**AFFIDAVIT**

STATE OF CALIFORNIA )

                            ) SS

COUNTY OF SAN DIEGO .)

        I, MATTHEW BROWN being duly sworn, depose and state:

<u>INTRODUCTION</u>

         1.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for approximately eleven (11) and one half years.  I am currently assigned to investigate individuals involved in violent crime, to include bank robberies in and around San Diego, California.

         2.    I received sixteen weeks training at the FBI Academy in Quantico, Virginia, where I received training in most aspects of law enforcement and criminal investigations.  In 1992 I began work on a Task Force investigating violent crime on a local, state and federal level.  My work on that task force allowed me to work closely with officers, investigators, detectives and agents from most law enforcement departments and/or agencies which operate in San Diego County.  In 1999 I began work on a squad whose responsibility it is to investigate violent crime, to include bank robberies.  In the year 2001 I was involved in the investigation of a large percentage of the one hundred eighteen (118) bank robberies which took place that year in San Diego County and in the year 2001, I was again involved in the investigation of a large percentage of the one hundred fifty four (154) bank robberies which took place in San Diego County.  Throughout my FBI career I have

1

1   been involved in the arrest of hundreds of individuals for a wide variety of violations and

2   have used almost every investigative tool available to the FBI.  I have also been the affiant

3   on nearly forty federal search warrants.

4          3.   My experience as a SA of the FBI, concentrated experience working

5   violent crime related offenses, conversations with other Special Agents of the FBI and local

6   investigators familiar with bank robberies and my training and experience form the basis of

7   the opinions and conclusions set forth below, which I drew from the facts set forth herein.

8          4.   I have personally conducted the investigation that is the subject of this

9   affidavit and am completely familiar with the facts outlined below.  That knowledge comes

10  from my personal participation in this investigation, including interviews with and my

11  analysis of reports submitted by other law enforcement agents participating with me in this

12  investigation.

13         5.   Based on my personal participation in this investigation, and on the

14  basis of reports submitted by other law enforcement officers, I submit that the facts

15  contained in the numbered paragraphs below demonstrate that there is probable cause to

16  believe that beginning on June 19, 2000 and continuing through July 2, 2001, within the

17  Southern District of California, RIDWAAN DOMINGO did knowingly and intentionally

18  rob nine banks whose deposits on the day and time of those robberies were insured by the

19  Federal Deposit Insurance Corporation (FDIC), in violation of Title 18, United States Code,

20  Section 2113(a);

21                    PROBABLE CAUSE

22         6.   California Department of Motor Vehicle (DMV) records and United

23  States Immigration and Naturalization Service (INS) records identify RIDWAAN

24  DOMINGO as a British male, born in Cape Town, South Africa, 5'9" in height and

25  weighing 170 pounds.  He has black hair and brown eyes, a date of birth of June 1, 1964

26  (thirty seven years old), a social security account number of 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, a California

27  driver license of A1198110 and an INS alien registration number of A76737729.

28         7.   The San Diego County Assessor's Property System as of May 2002

1  reflects Ridwaan and Patrice R. Domingo as the joint owners of the single family residence

2  located at 30407 Cool Valley Highlands Road, Valley Center, California 92082.  Records

3  reflect that the home was originally purchased by Patrice R. Domingo as a married woman,

4  as her sole and spearate property on October 30, 1996, for $487,000.   The California

5  Department of Motor Vehicles (DMV) drivers license records as of May 2002 reflect

6  Domingo's home address as 30407 Cool Valley Highlands Road, Valley Center, California

7  92082.   An April 2002 DMV vehicle registration records check for a 2000 Ford pickup

8  truck bearing California license plate 6E70543 in the name of Domingo reflects the same

9  home address for him.  In May 2002, the United States Postal Inspection Service confirmed

10  that Domingo receives mail at this address.  Additionally, his employer, 24-Hour Fitness

11  Center's payroll administration advised as recently as May 2002 that Domingo's home

12  address with the company is still listed as the same address in Valley Center.

13          8.    The INS record for Domingo reflects that his wife is Patrice Domingo.

14  Patrice Domingo's former marriage to one Gregory A. Soulds was dissolved on May 24,

15  1991.  The divorce decree required that her ex-husband pay her $775.00 alimony per month

16  until she re-married and she was to pay her ex-husband $375.00 per month child support.

17  The conclusion is that money deposited into the Domingos' bank accounts during the course

18  of the time in question, June 19, 2000 to July 2, 2001 would not have included alimony

19  based on Patrice Soulds (now Domingo) remarried well before this time frame..

20          9.    On July 25, 2001, based on the vehicle identification number

21  (1FTYR10V8YPA62503) assigned to Domingo's Ford pickup truck, Ford Motor

22  Company's Government Regulations Division documented that the truck was manufactured

23  with a factory paint color of  white.

24          10.    The nine banks alleged herein to have been robbed by Ridwaan

25  Domingo took place accordingly.  On Monday, June 19, 2000 at approximately 10:10 a.m.,

26  the Washington Mutual Bank, 9994 Scripps Ranch Boulevard, San Diego, California was

27  robbed by a lone male described as being of Hispanic decent.  The robber entered the bank

28  carrying a motorcycle helmet and a navy blue, zippered vinyl bank bag.  He proceeded to

3

1  the customer service island and wrote something on a piece of paper. He then approached

2  the victim teller and handed her a computer generated demand note printed on a piece of

3  white paper which read something to the effect of "PUT $10,000.00... 20's, 50's, 100's..."

4  The teller complied and the robber placed the money in the bank bag and departed the bank.

5  A getaway vehicle was not observed. The robber wore black jeans, a light blue sweatshirt,

6  black tennis shoes, blue and white batting gloves, a navy blue baseball cap with a white star

7  emblem, Oakley style sunglasses and carried a white motorcycle helmet with five horizontal

8  multi-colored stripes around the back of the helmet and a tinted face shield. Witnesses

9  described him as being either a Hispanic or middle eastern male, 22-25 years old, 5'6" tall,

10  having a medium build with dark short hair, and a dark mustache. The bank incurred a loss

11  of $7,000.00. This robbery was recorded on bank surveillance video tape on the day of the

12  robbery. A copy of a still photograph of the surveillance tape is attached as part of this

13  affidavit in Attachment C.

14         11.  On Thursday, June 29, 2000 at approximately 10:05 a.m., the

15  Washington Mutual Bank, 5825 Balboa Avenue, San Diego, California was robbed by a

16  lone male, described as being of Hispanic decent. The robber entered the bank wearing

17  white riding gloves, carrying a white motorcycle helmet with a tinted face shield. He placed

18  a grey vinyl bank bag on the teller counter with a computer generated demand note on top

19  of the bag. The note read something to the effect of, "I want 100's, 50's, 20's..." The robber

20  then made a comment out loud to the effect of, "This is no joke. This is no joke." The

21  teller complied and the robber departed the bank out of sight. The robber wore a long

22  sleeved faded sweatshirt, faded blue jeans, brown shoes, a blue baseball cap with a white

23  star as an emblem and mirror sunglasses. The robber was described as a Hispanic male, late

24  20's, 5'9"-5'10, having a medium build, short black hair with a dark mustache and goatee.

25  The bank incurred a loss of $1,615.00. This robbery was recorded on bank surveillance

26  video tape on the day of the robbery. A copy of a still photograph of the surveillance tape is

27  attached as part of this affidavit in Attachment C.

28         12.  On Thursday, August 10, 2000 at approximately 10:00 a.m., the Wells

4

1   Fargo Bank, 4380 La Jolla Village Drive, San Diego, California was robbed by a lone male,

2   described as being of Hispanic decent.  The robber entered the bank and stood in a long line

3   of customers.  Because of the long line of regular customers, the merchant teller called for

4   the next customer who happened to be the robber.  The robber was carrying a motorcycle

5   helmet and upon reaching the teller counter, placed a blue merchant bank bag on it and on

6   top of the bag, placed a computer generated demand note which read something to the effect

7   of, "Give me 100's and 50's in the bag.  No dye pack."  The teller complied, handing money

8   to the robber after which he depated the bank and was out of sight.  The teller wore a light

9   blue baseball cap and a light blue polo style shirt buttoned all the way up to his neck.  The

10  motorcycle helmet was described as red or orange in color.  The robber was described as a

11  Hispanic male in his early thirties, 5'6"-5'7" with a medium build, a smooth brown

12  complexion and speaking proper English.  The bank incurred a loss of $5,150.00.  This

13  robbery was recorded on bank surveillance video tape on the day of the robbery.  A copy of

14  a still photograph of the surveillance tape is attached as part of this affidavit in Attachment

15  C.

16          13.    On Thursday, August 31, 2000 at approximately 5:00 p.m., the

17  Washington Mutual Bank, 295 S. Rancho Sante Fe Road, San Marcos, California was

18  robbed by a lone male described as being of Hispanic decent.  The robber entered the bank

19  carrying a blue vinyl bank bag and presented a computer generated demand note to an

20  available teller.  The note read something to the effect of, "We are not joking.  Follow these

21  instructions and you won't get hurt."  The teller recognized that there was more verbage to

22  the note, but chose not to continue reading it.  She complied, gave the robber cash in

23  addition to a dye pack which the robber proceeded to throw back to her after discovering it

24  within a bundle of cash.  The robber exited the bank and was out of sight.  The robber was

25  described as a Hispanic male in his early thirties, 5'8", 200 pounds with a dark complexion

26  and having a mustache and goatee.  He wore a blue long sleeved sweatshirt, a red baseball

27  cap and dark sunglasses.  The bank incurred a loss of $14,109.00.  This robbery was

28  recorded on bank surveillance video tape on the day of the robbery.  A copy of a still

5

1 | photograph of the surveillance tape is attached as part of this affidavit in Attachment C.

2 |        14.   On Monday, November 6, 2000 at approximately 10:00 a.m., the

3 | Washington Mutual Bank, 295 South Rancho Santa Fe Road, San Marcos, California was

4 | robbed by a lone male described as being Caucasian. The robber entered the bank and

5 | placed a blue nylon bank bag on the teller counter. The bag was believed possibly to have

6 | been a Great Western Bank bag. He then proceed to place a computer generated demand

7 | note on top of the bag. The note read something to the effect of, "Stay calm. This is not a

8 | joke...." The teller complied and handed cash to the robber. After receiving cash from the

9 | teller, the robber stated aloud, "Stop playing with me. Give me more money. Give me

10 | more 100's!" The teller complied, the robber looked through the money he had received and

11 | exited the bank. The robber was described as a white male with a tan complexion, 5'6"-

12 | 5'7", 140-150 pounds, having a thin build, a mustache and speaking with a slight accent. He

13 | wore a blue baseball cap, a blue windbreaker, square wrap around dark sunglasses with a

14 | black nylon sunglass strap. The bank incurred a loss of $10,079.00. This robbery was

15 | recorded on bank surveillance video tape on the day of the robbery. A copy of a still

16 | photograph of the surveillance tape is attached as part of this affidavit in Attachment C.

17 |        15.   On Wednesday, January 24, 2001 at approximately 10:35 a.m., the

18 | Washington Mutual Bank, 501 "H" Street, Chula Vista, California was robbed by a lone

19 | male described to be of Hispanic decent. The robber entered the bank and presented a

20 | demand note to an available teller. The teller only read, "100's" on the note and then began

21 | gathering money for the robber. The teller handed the robber the money after which he

22 | demanded more money causing her to open her second drawer and withdraw two clips of

23 | one hundred dollar bills and give them to the robber. The robber placed the cash in what

24 | was believed to have been a Bank of America bank bag which he had with him. He then

25 | fled the bank on foot and out of sight. The robber was described as a Hispanic male, late

26 | twenties to mid thirties, 5'7"-5'8", having a thin build, a full mustache, a triangularly shaped

27 | face and black straight hair. He wore a baseball cap, black sunglasses, a puffy/padded navy

28 | blue jacket, jeans and tennis shoes. The bank incurred a loss of $8,262.00. This robbery

1   was recorded on bank surveillance video tape on the day of the robbery.  A copy of a still

2   photograph of the surveillance tape is attached as part of this affidavit in Attachment C.

3      16.   On Thursday, February 22, 2001 at approximately 11:15 a.m., the

4   Washington Mutual Bank, 29640 Rancho California, Temecula, California was robbed by a

5   lone male described to be of Hispanic decent.  The robber entered the bank carrying a blue

6   bag.  He placed the bag on the teller counter with a computer generated note on top of the

7   bag.  The note read something to the effect of, "I need $10,000.00.  No marked bills.  No

8   dye.  Be calm.  No jokes."  The teller complied and handed cash over to the robber.  After

9   receiving the money, the robber told the teller that he wanted more money and told the teller

10   to go to her bottom drawer to retreive it.  Again the teller complied and the robber departed

11   the bank and was out of sight.  The robber was described as a Hispanic male, thirty years

12   old, 5'10", 150-165 pounds with a medium build, mustache and chin hair.  He wore a grey

13   sweatshirt with "Everlast" across the chest, black jeans,  a black baseball cap with a logo

14   and sunglasses.  The bank incurred a loss of $3,402.00.  This robbery was recorded on bank

15   surveillance video tape on the day of the robbery.  A copy of a still photograph of the

16   surveillance tape is attached as part of this affidavit in Attachment C.

17      17.   On Monday, March 5, 2001 at approximately 3:40 p.m., the

18   Washington Mutual Bank, 935 E. Vista Way, Vista, California was robbed by a  lone male

19   described to be of Hispanic decent.  The robber approached an available teller and handed

20   the teller a blue bank deposit bag with the words "Great Western" on it, along with a long

21   handwritten demand note which read something to the effect of, "This is not a joke, put 50,

22   20, 10 in the bag, no bait money, no dye packs, do it now."  The teller complied and the

23   robber placed the money along with the demand note into the bank bag.  The robber exited

24   the bank and was out of sight.  The robber was described as a Hispanic male, 25-26 years

25   old, 5'5", 145 pounds, slim build with a medium colored, smooth complexion, black hair

26   and having a long black mustached that covered his mouth.  He wore a light blue jacket,

27   grey t-shirt, blue baseball cap and dark sunglasses with light neon green trim in a diamond

28   shape.  The bank incurred a loss of $4,435.00.  This robbery was recorded on bank

1  surveillance video tape on the day of the robbery.  A copy of a still photograph of the

2  surveillance tape is attached as part of this affidavit in Attachment C.

3          18.   On Monday, July 2, 2001 at approximately 9:30 a.m., the Washington

4  Mutual Bank, 9994 Scripps Ranch Boulevard, San Diego, California was robbed by a lone

5  male described to be of Hispanic decent.  The robber entered the bank and waited in the

6  customer service line.  A teller, uncomfortable with the robber's appearance, in that he was

7  wearing sunglasses and a ball cap, asked the robber to remove his sunglasses.  The robber,

8  appearing agitated, removed his sunglasses.  The robber the approached a different teller

9  and had with him a zippered bank bag.  He placed the bag on the counter with a note on top

10  of it.  The note was type written in a large font on plain white paper and appeared to be

11  weathered.  After seeing the note and the robber, the victim teller realized that she was

12  being robbed by the same robber who had robbed her approximately one year prior

13  (referring to the June 19, 2000 robbery of the same bank).  The teller stated aloud to the

14  robber, "I don't have it!"  Fearful that the robber would become agitated, the victim teller

15  pulled some money from her teller drawer and handed it to the robber.  The robber grabbed

16  the money and his demand note and approached another teller.  A customer was at the

17  second teller's station and the robber pushed that customer aside then stated to the teller,

18  "Give me all your 100's."  After making that statement, the robber reached over the counter

19  and grabbed the approximate $420.00 cash deposit that the customer had just given the

20  teller.  The teller told the robber that she did not have any 100's.   The robber pointed to the

21  teller's drawer and told her to give him the money.  The teller proceeded to hand the robber

22  a stack of money which had a two dollar bill on top of it and told the robber that the cash

23  underneath the two dollar bill was all one hundred dollar bills.  The robber next requested

24  the teller give him the cash in her second teller drawer to which the teller advised she did

25  not have a second teller drawer.  The robber then turned and exited the bank.  A security

26  guard assigned to the bank was outside the bank, having been notified by a bank customer

27  that the bank was being robbed, observed a male he determined to be the robber walk past

28  him through the bank's parking lot and continuing eastbound towards Pomerado Road.  A

8

1   citizen who was driving northbound on Scripps Ranch Boulevard towards the direction of

2   the bank, observed a male (unable to determine the race) wearing a dark baseball cap, long

3   sleeved dark shirt, dark pants and carrying a blue bank deposit bag running soutbound on

4   Scripps Ranch Boulevard from the general area of the Washington Mutual Bank.  He

5   observed the male get into a white standard cab Ford Ranger pickup truck which had been

6   parked on Scripps Ranch Boulevard and thereafter traveled southbound on Scripps Ranch

7   Boulevard towards Pomerado Road and out of sight .  The bank incurrred a loss of

8   $5,072.00.  This robbery was recorded on bank surveillance video tape on the day of the

9   robbery.  A copy of a still photograph of the surveillance tape is attached as part of this

10   affidavit in Attachment C.

11         19.   On July 17, 2001 the FBI was contacted by a manager of the Carmel

12   Mountain branch of Washington Mutual Bank who advised that in viewing a flyer prepared

13   by their security specialist containing bank surveillance photographs of captioned robber

14   provided by the FBI, they recognized the robber as possibly being one RIDWAAN

15   DOMINGO, a regular customer of their branch.  Provided to the FBI by the bank was the

16   DOMINGO's Great Western Bank (now Washington Mutual Bank) Signature Card and

17   Agreement for account number 378-800904-5, dated August 25, 1997 in the name of

18   Patrice Domingo, date of birth: February 19, 1959, social security account number: 563-37-

19   9723, California Driver License: N6888493 and Ridwaan Domingo, date of birth: June 1,

20   1964, social security account number: 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, California Driver License: A1198110,

21   both with a home address of 30407 Cool Valley Highlands Road, Valley Center, California

22   92082 and home telephone: 760/749-6921.

23         20.   On July 19, 2001, an employment check conducted by the FBI with the

24   State of California Employment Development Department (EDD) for the name of Ridwaan

25   Domingo, social security account number: 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 revealed that from 1999 through

26   the fourth quarter of 2000, Domingo was employed by the San Diego County Credit Union,

27   reflecting an address of 9985 Pacific Heights Boulevard, San Diego, California.  During the

28   same time period, EDD also showed Domingo employed at 24-Hour Fitness, P.O. Box

1    92409, Carlsbad, California.

2         21.   Payroll records obtained from 24-Hour Fitness in the name of Ridwaan

3    Domingo reflect that he is an aerobics instructor who instructs at both the Rancho Bernardo

4    and Escondido 24-Hour Fitness facilities within San Diego County.  For the year 2000,

5    Domingo's 24-Hour Fitness W-2 Wage, Tips and Other Compensation reflected his income

6    as $2,474.00.  Time sheets reviewed for this employment revealed that the blocks of times

7    of aerobics  instruction conducted by Domingo when compared to the dates and times of the

8    above captioned bank robberies reflected no conflicts.  Of the nine robbery dates, Domingo

9    instructed classes on the same day as three of them, i.e., June 19, 2000 from 4:00 p.m. to

10   5:15 p.m. (bank robbed at 10:10 a.m.), November 6, 2000 from 4:30 p.m.  to 5:30 p.m.

11   (bank robbed at 10:00 a.m.) and March 5, 2001 from 10:00 a.m. to 11:15 a.m. (bank robbed

12   at 3:40 p.m.).  The banks which were robbed on the same days on which Domingo

13   instructed aerobics classes were all three within an approximate twenty minute drive of the

14   locations at which the classes took place.

15        22.   Employment records obtained from the San Diego County Credit

16   Union (SDCCU) in the name of Ridwaan Domingo reflect that he was employed there as a

17   Computer Programmer in their Information Technology Department from August 30, 1999

18   to November 2, 2000.  This employment covered  the time frame for the referenced bank

19   robberies on June 19, 2000, June 29, 2000, August 10, 2000 and August 31, 2000.

20   Domingo's gross pay for his year 2000 employment through his final day of November 2,

21   2000 was $26,794.87.  His employer advised that he was counseled on several occasions for

22   an absence from work problem.  The documented absenteeism consisted of his reporting

23   late for work on several occasions, anywhere from fifteen minutes to two hours and fifteen

24   minutes.  Although the company does not have record of his having reported late for work

25   and/or having been absent on the above four dates, they advised that it is possible for an

26   employee in a unit such as that in which Domingo was employed  to come and go without

27   such absence necessarily having been noticed and/or documented.  The first three dates'

28   bank robberies were at 10:10 a.m., 10:05 a.m. and 10:00 a.m. respectively.  The fourth

1  date's robbery was at 5:00 p.m. which would have been anywhere from one half an hour to

2  one and one half hours following the end of Domingo's work day, therefore having allowed

3  him to rob the bank without absence from work.

4          23.   On August 17, 2001, Agents of the FBI, having obtained a schedule of

5  Domingo's aerobics intruction, conducted a surveillance at the 24-Hour Fitness Center in

6  Escondido, California.  The Agents were aware of the fact that a witness observed the

7  robber in the last robbery (July 2, 2001) get into a white Ford Ranger pickup truck

8  immediately following the robbery.  At the time of the surveillance, in the possession of the

9  Agents were the bank surveillance photographs from the above captioned banks along with

10  the California Department of Motor Vehicles Driver License photograph of Domingo.

11  Minutes prior to the beginning of Domingo's 10:00 a.m. "Body Pump" aerobics class, the

12  Agents observed the arrival of a newer model white Ford Ranger pickup truck occupied by

13  two males and bearing California license plate 6E70543.  Photographs were taken of the

14  two occupants as they exited the vehicle and walked towards the entrance to the facility and

15  then again when approximately one and one half hours later, the same two individuals

16  exited the facility and entered the same truck.  Based on the Agents' training and experience

17  in viewing individuals in person and/or in individual photographs and thereafter comparing

18  such to bank robbery surveillance photographs, it was the Agents' opinions that the driver of

19  the truck was Ridwaan Domingo (this based on having viewed his California Driver

20  License photograph) and that he strongly resembled the individual depicted as the robber in

21  the nine bank surveillance photographs.

22          24.  A detailed financial analysis was conducted by the FBI of Domingo and

23  his wife covering the period of time June 19, 2000 to July 2, 2001.  The conclusion drawn

24  was that the Domingos were living a lifestyle beyond their financial means.  The financial

25  analysis  reflected several cash transactions which pointed to having been directly

26  associated with the dates of and the proceeds derived from the above captioned bank

27  robberies.  For the purpose of this analysis, a cash transaction was defined as cash deposited

28  into an account which could not be accounted for as having been derived from a legitimate

1    source of income from either Ridwaan or his wife, Patrice, or of having been transferred

2    from one of the Domingos' accounts to another of the Domingos' accounts.  A cash

3    transaction in this analysis was also exhibited as a cashier's check written to a creditor with

4    no legitimate source of funds for the check.

5            25.  For the sake of this financial analysis, legitimate income was

6    documented as Ridwaan Domingo's 24-Hour Fitness pay which appeared to have either

7    been deposited into the Domingos' joint checking account at the San Diego County Credit

8    Union (SDCCU) or cashed.  His total wages, tips and other compensation per his year 2000

9    24-Hour Fitness W-2 was $2,474.00 gross.  His 2001 like income through the date of his

10    last bank robbery in July was $2,977.50 gross.  The second source of legitimate income was

11    Ridwaan's SDCCU pay which in the year 2000 per SDCCU payroll was $26,794.87 gross.

12    This pay was in the form of direct deposit into the SDCCU joint checking account.  The

13    third source of legitimate income was Patrice Domingo's 24-Hour Fitness pay which was

14    $26,534.16 gross in 2000 and $26,250.92 in the year 2001.  Patrice's pay during the time

15    frame of the investigation was directly deposited into the Domingos' joint Washington

16    Mutual savings account and then transferred regularly to their joint Washington Mutual

17    checking account.  All of these legitimate sources of income were eliminated as accounting

18    for the cash deposits in question.  The cash deposits addressed herein number forty nine

19    (49).  Of the forty nine cash deposits, only four are an odd amount (not rounded to five, ten,

20    one hundred, or one thousand).  Based on your affiant's training and experience in

21    investigating bank robberies, it can be stated that the rounded amounts are consistent with

22    bank robbery proceeds and particularly in this series with the robber demanding large bills

23    such as 50's and 100's (fifty and one hundred dollar bills).

24            26.  The total loss amount incurred as a result of the above captioned nine

25    bank robberies was $64,124.00.  The financial analysis reflected a total of $48,805.74 cash

26    transactions (as defined above) associated with the Domingos' accounts at Washington

27    Mutual Bank, San Diego County Credit Union and through payment to their mortgage

28    company, Downey Savings.  More specifically in relation to each robbery, the following

1  details are noted.  The first robbery ($7,000.00) was on June 19, 2000.  The same day,

2  $4,370.00 cash was deposited throughout three of the Domingos' accounts.  Four days later,

3  on June 23, 2000, $2,325.65 cash (for a total between all accounts of $6,695.65 cash) was

4  deposited into their San Diego County Credit Union (SDCCU) and their mortgage payment

5  of $3,035.65 was made also on June 23, 2000 with a check drawn on the same account.

6       27.  The second robbery ($1,615.00) was on June 29, 2000.   Between June

7  30, 2000 and August 9, 2000 (the day before the third robbery), $3,630.00 cash was

8  deposited throughout three of the Domingos' accounts.  Of this amount of cash deposited,

· 9  $1,160.00 was deposited into the SDCCU account on July 13, 2000.  Their July mortgage

10  payment was made on July 14, 2000 in the amount of $2,889.74 with a check drawn on the

11  same account.

12       28. The third robbery ($5,150.00) was on August 10, 2000.   The same day,

13  four separate cash deposits were made into two of the Domingos' accounts totaling

14  $3,050.00.  Specifically on this date, $500.00 cash and $100.00 cash were deposited into

15  one account and $2,300.00 cash and $150.00 cash were deposited into the SDCCU account.

16  Also on August 14, 2000, $700.00 cash was deposited into the SDCCU account (for a total

17  deposit between all accounts of $3,750.00 cash).  On August 14, 2000, a cashier's check for

18  the mortgage  in the amount of $2,889.74 was drawn against the SDCCU account.

19       29.  The fourth robbery ($14,109.00) was on August 31, 2000.  The

20  following day, $3,000 cash was deposited into the Domingos' SDCCU  account and on

21  September 5, 2000, $550.00 cash (for a total of $3,550.00 cash between all accounts) was

22  deposited throughout their accounts.  Their September mortgage payment of $2,889.74 was

23  made on September 11, 2000 with a check drawn on the SDCCU account.

24       30.  The fifth robbery ($10,079.00) was on November 6, 2000.  The same

25  day $3,500.00 cash was deposited into the Domingos' SDCCU account.  The following day

26  $1,000.00 was deposited into the same account and between November 20, 2000 and

27  January 3, 2001 $2,110.00 cash was deposited also into the same account (for a total of

28  $6,610.00 into the SDCCU account).  Their November mortgage payment of $2,889.74 was

13

1  made on November 7, 2000, the day following this robbery, with a check drawn on the

2  SDCCU account.

3        31.  The sixth robbery (<u>$8,262.00</u>) was on January 24, 2001.  On the same

4  day $1,000.00 cash was deposited into the Domingos' SDCCU account and the following

5  day, January 24, 2001, $545.00 cash was deposited into one of their other accounts.  On the

6  same day as the robbery (January 24, 2001), a cashiers check for their mortgage payment in

7  the amount of $5,925.39 was issued by Downey Savings and Loan Association.  There were

8  no transactions of any kind reflecting that any funds were drawn from any of the Domingos'

9  accounts.  Downey Savings, the Domingos' mortgage lender, confirmed on May 23, 2002

10  that the source of funds for the $5,925.39 cashier's check on January 24, 2001 was cash.

11  They also confirmed that this amount covered both the January and February 2001

12  mortgage payments.  In summary, a total of <u>$7,470.39</u> cash was deposited or used within

13  one day of the January 24, 2001 robbery.  Additionally, on February 5, 2001, $180.00 cash

14  was deposited into one of the Domingos' accounts.

15        32.  The seventh robbery (<u>$3,402.00</u>) was on February 22, 2001.  On the

16  same day, $1,200.00 cash was deposited into the Domingos' SDCCU account.  Four days

17  later on February 26, 2001, $1,324.35 cash was deposited into the same account.  Therefore,

18  a total of <u>$2,524.35</u> cash was deposited within four days of the robbery into the SDCCU

19  account.

20        33.  The eighth robbery (<u>$4,435.00</u>) was on March 5, 2001.  The following

21  day, $600.00 cash was deposited between two of the Domingos' accounts.  Thereafter,

22  between March 8, 2001 and June 30, 2001, $9,945.35 cash was deposited between three of

23  their accounts.   As part of that amount, on April 4, 2001, $3,000.00 cash was deposited

24  into the SDCCU account and on April 16, 2001 the mortgage payment was made via a

25  check drawn on this account in the amount of  $3,100.96.  Also as part of this amout, on

26  June 30, 2001 $1,910.35 cash was deposited into the SDCCU account and on the same day,

27  a mortage payment in the amount of $3,263.83 was drawn on the same account.  In

28  summation, following the eighth robbery between March 6, 2001 and June 30, 2001,

14

1   $10,545.35 cash was deposited throughout the Domingos' accounts.

2       34. The ninth robbery ($10,072.00) was on July 2, 2001. The same day,

3   $1,200.00 cash was deposited into one of the Domingos' accounts and $1,000.00 cash into

4   their SDCCU account. On July 6, 2001 $300.00 cash was deposited into the SDCCU

5   account and on July 9, 2001 $650.00 cash was deposited into the SDCCU account, all

6   totaling $3,150.00 cash deposited throughout the Domingos' accounts. On July 30, 2001 a

7   cashier's check for the mortgage in the amount of $3,243.83 was drawn against the SDCCU

8   account.

9       35. On June 3, 2002, United States District Court, Southern District of

10  California search warrant, case number '02 mg1234, signed by the Honorable U.S.

11  Magistrate Judge Anthony J. Battaglia on May 31, 2002 was executed by Agents of the FBI

12  at the Domingos' residence, 30407 Cool Valley Highlands Road, Valley Center, California

13  92082. Sought during this search warrant were various items which would definitively link

14  Ridwaan Domingo to the referenced bank robberies.

15      36. Seized during the execution of the search warrant were the following

16  pieces of evidence:

17      i) Blue FILA jacket (identical to that worn in the November 6, 2000 and

18  January 24, 2001 bank robberies.

19      ii) A BUM Equipment red baseball cap identical to that hat worn during the

20  August 31, 2000  and July 2, 2001 bank robberies.

21      iii) A LAPD SWAT team black baseball cap identical to that hat worn

22  during the November 6, 2000 and March 5, 2001 bank robberies.

23      iv) Blue motorcycle riding gloves identical to those worn during the June 19,

24  2000, June 29, 2000 and August 10, 2000 bank robberies.

25      v) Light blue sweatshirt with loose neckline identical to that sweatshirt worn

26  during the June 19, 2000, June 29, 2000 and August 31, 2000 bank robberies.

27      vi) White motorcycle helmet with mutli-colored horizonal stripes and a

28  tinted windshield identical to that helmet carried by the robber during the June 19, 2000 and

1  June 29, 2000 bank robberies.

2  vii) Photographs of Ridwaan Domingo wearing a gray EVERLAST

3  sweatshirt identical to that sweatshirt worn by the robber in the February 22, 2001 bank

4  robbery.

5  viii) Photographs of Ridwaan Domingo wearing a light blue sweatshirt with

6  a loose neckline as referenced above in number "v."

7  ix) Photographs of Ridwaan Domingo wearing a baseball cap identical to

8  that hat worn by the robber during the January 24, 2001 and February 22, 2001 bank

9  robberies.

10  37.  During the execution of the search warrant, Patrice Domingo (Ridwaan's

11  wife) was interviewed by FBI Agents.  She was shown the bank surveillance photographs

12  depicted in Attachment "C" attached hereto.  Patrice identified her husband in each of the

13  nine bank robbery photographs.  Patrice also advised that the white helmet with multi-

14  colored stripes belonged to her and stated that her husband had obviously used it on the

15  referenced occasions.  Patrice also advised that she recognized all of the other clothing

16  worn by the robber as belonging to her husband.  Patrice indicated that her husband was in

17  charge of the family's finances and that although she knew that they were struggling

18  financially, her husband had told her repeatedly that in addition to borrowing money from

19  his father, he was also able to borrow money from friends to allow them to meet their

20  financial obligations.  As evidence that the Domingos were financially strapped, she advised

21  that within the past few months, they chose to pawn their wedding rings and other jewelry

22  in attempt to meet some financial obligations.

23  38.  Also interviewed during the execution of the search warrant was

24  Ridwaan Domingo's twenty year old stepson (Patrice Domingo's son from her first

25  marriage), Morgin Soulds, who resides with the Domingos.  Although Soulds, similar to his

26  mother was not aware that Ridwaan Domingo was robbing banks, when shown the nine

27  bank robbery surveillance photographs, he, like Patrice Domingo, identified Ridwaan

28  Domingo as the individual depicted in the photographs.

16

1    39.  During the execution of the search warrant, Ridwaan Domingo was

2    advised of his Miranda Rights in an attempt to conduct and interview of him.  He invoked

3    his right to counsel.

## SUMMARY

4

5    40.  It is your affiant's opinion, based on the above documented evidence,

6    that the Domingos' financial obligations were beyond their legitimate financial means,

7    hence  the motivation behind the bank robberies and resulting cash deposits into their bank

8    accounts and relating mortgage payments.

9    41.  As further evidence that the Domingos have lived beyond their means is

10   the fact that the San Diego County Automated Regional Justice Information System

11   computer database cooborates Patrice Domingo's statement reflecting that six months

12   following the last robbery (July 2, 2001), on January 11, 2002, Ridwaan Domingo pawned

13   several pieces of jewelry at a pawn shop in Valley Center, California.

14   42.  Domingo's age of 37 (36 in 2000), height of 5'9", weight of 170 pounds,

15   facial features, dark hair color and facial hair are well represented in the depiction of the

16   robber in the attached nine bank robbery surveillance photographs and quite closely match

17   those descriptions offered by witnesses at the victim banks.

18   43.  Although employed, Domingo's work schedules neither conflicted nor

19   prohibited him access to the banks at the times and dates of the above captioned bank

20   robberies.  Additionally, he has a driver's license, and vehicle at his disposal, thereby

21   allowing him to drive to and from the banks.

22   44.  As documented, Domingo was previously employed at the San Diego

23   County Credit Union, allowing him to become more familiar perhaps than the average bank

24   customer with the procedures by which a bank operates on a daily basis.

25   45.  As an aerobics instructor, Domingo shows by definition an active

26   participation in an athletic lifestyle.  The bank surveillance photographs depict a male with

27   an athletic build, wearing athletic clothing to include baseball caps with team emblems and

28   logos, a baseball cap in two bank robberies with the name "Bum" (representing Bum

1  Equipment), a jacket with the name "FILA," a sweatshirt with the name "EVERLAST"

2  imprinted in large letters in addition to sweatshirts in five of the robberies.

3        46.  California Department of Motor Vehicles, in addition to reflecting a

4  white Ford Ranger pickup truck registered in the name of Domingo (fitting the description

5  of the "getaway" vehicle in the last robbery), reflect Domingo as having a motorcycle

6  license.  The motorcycle license is significant in that the robber carried a motorcycle helmet

7  with him and wore motorcycle riding gloves in the first three robberies, likely representing

8  the fact that the robber rode a motorcycle to and from the first three robberies.

9        47.  The execution of the search warrant of the Domingos' house on June 3,

10  2002 resulted in the seizure of several articles of clothing, to include a sweatshirt, a jacket,

11  baseball caps, a pair of motorcycle riding gloves, in addition to a motorcycle helmet and

12  several photographs definitively linking Ridwaan Domingo to the captioned bank robberies.

13        48.  Based upon my experience and training, consultation with other law

14  enforcement officers experienced in bank robbery investigations, all the facts and opinions

15  set forth in this affidavit, the evidence seized during the execution of the June 3, 2002

16  search warrant on Domingo's residence and the statements offered by his wife and stepson,

17  there is probable cause to believe that Ridwaan Domingo committed the referenced nine

18  bank robberies, specifically on June 19, 2000, June 29, 2000, August 10, 2000, August 31,

19  2000, November 6, 2000, January 24, 2001, February 22, 2001, March 5, 2001 and July 2,

20  2001, all in violation of Title 18, United States Code, Section 2113(a).

21

22

23  Matthew Brown
     Special Agent

24  Federal Bureau of Investigation

25  Subscribed and Sworn to before
    me this 4th day of June, 2002.

26

27  United States Magistrate Judge

28

18

Attachment "C"




June 19, 2000



June 29, 2000



August 10, 2000



August 31, 2000



November 6, 2000



January 24, 2001



February 22, 2001



March 5, 2001



July 2, 2001



24 Hour Fitness surveillance
August 17, 2001